NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
MONICA E. TAIT (Cal. Bar No. 157311)
SCOTT PAETTY(Cal. Bar No. 274719)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2931/6527
    Facsimile: (213) 894-6269
    E-mail:   Monica.Tait@usdoj.gov/
              scott.paetty@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 07-1402-SJO |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION WITH RESPECT TO SENTENCING RE ALBERINO MAGI; MEMORANDUM IN SUPPORT; EXHIBITS |
| v. | |
| ALBERINO MAGI, | Sentencing Date: 1/16/2018 |
| Defendant. | Time: 9:00 a.m. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Monica E. Tait, hereby files its position with respect to sentencing as to defendant ALBERINO MAGI.

////

This Position is based upon the attached memorandum of points and authorities and exhibits, the files and records of this case, and such further evidence and argument as the Court may permit.

Dated: January 8, 2018                    Respectfully submitted,

                                          NICOLA T. HANNA
                                          United States Attorney

                                          LAWRENCE S. MIDDLETON
                                          Assistant United States Attorney
                                          Chief, Criminal Division


                                                /s/ Monica E. Tait
                                          MONICA E. TAIT
                                          SCOTT PAETTY
                                          Assistant United States Attorneys

                                          Attorneys for Plaintiff
                                          UNITED STATES OF AMERICA

# TABLE OF CONTENTS

                                                                    **PAGE**

TABLE OF AUTHORITIES ............................................ii

I.    INTRODUCTION................................................1

II.   FACTS......................................................1

      A.   The Plea Agreement....................................1

      B.   MAGI joined the lottery scheme conspiracy as a
           telemarketer no later than November 30, 2006, after
           partnering with Bellini on other fraud schemes...........3

      C.   MAGI was Recorded Pitching the Scheme to Victims and
           Potential Victims.....................................9

III.  SENTENCING GUIDELINES ANALYSIS..............................9

      A.   The Parties Agree on the Base Offense Level and on One
           Specific Offense Characteristic........................9

      B.   Loss is Over $250,000 but Not More Than $550,000........10

      C.   The Offense Was Committed by Mass Marketing and There
           Were Ten or More Victims..............................10

      D.   MAGI Knew or Should Have Known That the Offense
           Involved Vulnerable Victims...........................11

      E.   The total offense level is 21..........................12

IV.   SENTENCING FACTORS........................................13

      A.   The Nature and Circumstances of the Offense and
           Characteristics of the Defendant......................13

      B.   The Need for the Sentence Imposed to Reflect the
           Seriousness of the Offense, to Promote Respect for the
           Law, and to provide just punishment for the offense......14

      C.   The Need to Avoid Unwarranted Sentence Disparities
           Among Defendants With Similar Records Who Have Been
           Found Guilty of Similar Conduct........................14

V.    CONCLUSION................................................17

i

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

United States v. Ciccone,
 219 F.3d 1078 (9th Cir. 2000) .................................... 10

United States v. Lloyd,
 807 F.3d 1128 (9th Cir. 2015) .................................... 10

United States v. Randall,
 162 F.3d 557 (9th Cir. 1998) ..................................... 10

**STATUTES**

18 U.S.C. § 371 .......................................................... 1

18 U.S.C. § 3553(a) ..................................................... 12

18 U.S.C. § 3553(a)(6) .................................................. 16

**SENTENCING GUIDELINES**

U.S.S.G. § 2B1.1(a)(2) ................................................. 11

U.S.S.G. § 2B1.1(b)(1)(G) .............................................. 11

U.S.S.G. § 2B1.1(b)(2) ................................................. 10

U.S.S.G. § 2B1.1(b)(2)(A)(i), (ii) ................................. 10, 12

U.S.S.G. § 2B1.1(b)(10)(b) ......................................... 9, 12

U.S.S.G. § 3A1.1(b)(1) ............................................. 10, 11

U.S.S.G. § 3E1.1 ...................................................... 12

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant ALBERINO MAGI ("defendant" or "MAGI") will shortly appear for sentencing on his plea to count one, conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371. The government contends that the offense level for this defendant is 21. Based on that offense level, the government moves under <u>Booker</u> for a variance sufficient to adjust defendant's offense level to level 15, to avoid sentencing disparity. The government requests that the court impose a sentence of 18 months imprisonment, 3 years supervised release, a special assessment of $100, and an order to pay restitution in the amount of $286,230.00.

## II.   FACTS

### A.   The Plea Agreement

Defendant pled guilty to count one, conspiracy to commit mail and wire fraud in violation of Title 18, United States Code, Section 371. Defendant's conviction is based on his participation in a fraudulent telemarketing operation based in Montreal, Quebec, Canada, that targeted elderly victims in both Canada and the United States. In the plea agreement, defendant agreed to the following statement of facts:

> Beginning as early as 2004, and continuing through on or about December 19, 2006, several individuals engaged in a conspiracy to commit mail and wire fraud. The conspiracy operated as follows: working in a location in Montreal, Quebec, Canada, defendant agreed with others to defraud victims in the United States and Canada, including victims located in the Central District of California. Defendant MAGI knowingly joined this conspiracy as a telemarketer prior to December 19, 2006, knowing that the conspiracy's objects were to defraud victims as stated above and intending to help accomplish them. Defendant's co-conspirators obtained "leads," that is, names and contact information of potential victims in the United States and

1

Canada.  Working from the leads, defendant and other telemarketers contacted victims by telephone and mail and falsely informed them that they had won a large sum of money in a sweepstakes or lottery.  As defendant then knew, this representation was false and fraudulent, as there was no sweepstakes or lottery, and the victims called had not won any sum of money from defendant or anyone with whom he was associated.

Defendant and other telemarketers falsely told the victims that, in order to collect their "winnings," the victims had to pay a sum of money, which defendant and the other telemarketers falsely represented was for taxes, administrative fees, insurance, legal fees, and other expenses that purportedly had to be paid before the "winnings" could be sent to the victims. As defendant then knew, these representations were false and fraudulent, as the victims had no reason to send money to defendant or anyone with whom he was associated.

Defendant and other telemarketers instructed the victims to send the money for the purported expenses and fees required for release of their winnings in a variety of ways: (i) By wire transfer via Western Union or MoneyGram, either in a name of the victim's choosing, or in a name supplied by the telemarketers; (ii) by mail or by commercial carrier, such as Federal Express, to an address supplied by the telemarketers; or (iii) by wire transfer from the victim's bank account into a bank account controlled by a co-conspirator.

In furtherance of the conspiracy, and to help accomplish its objects, defendant MAGI, together with his co-conspirators, committed and willfully caused others to commit the following overt acts:

On December 14, 2006, defendant MAGI contacted codefendant Van Wade Bedford, provided him with the name and contact information for victim C.R. (telephone number XXX-XXX-3471), and informed defendant Bedford that victim C.R. had already sent $2,500 twice to cover the taxes on the prize; that the names used to contact victim C.R. were "Glen Ross" and "Robert Knowles"; and that defendant Bedford was to act as the supervisor.

On December 18, 2006, codefendant John Bellini contacted defendant MAGI and discussed whether MAGI would work with codefendants April Frances Muir and Arlene Grundy.

(Plea agreement at pp. 7-9.)

As part of the investigation of this matter, the Royal Canadian Mounted Police ("RCMP") conducted a 6-week wiretap of numerous phones

2

connected to multiple participants in the scheme.  Based on the wiretap and RCMP's seizure of search warrant evidence (which RCMP refers to as "Exhibits") from various defendants, its analysis of Western Union and MoneyGram records, and interviews with certain victims, RCMP linked more than 150 victims to the entire fraud scheme.  (Exh. 1 (Victim Summary as of November 21, 2007 by Sgt. Yves Leblanc)).  The government has filed separately, under seal, the underlying data prepared by RCMP in accordance with Sgt. Leblanc's discussion in Exhibit 1, from which the loss amounts described in section III.B.2 below were derived, itemizing loss by each victim.  See GOVERNMENT'S FILING OF LOSS ANALYSIS LISTING VICTIMS, DATES OF LOSSES, AND AMOUNTS LOST IN CONNECTION WITH SENTENCING, docket no. 589.[1]

### B.  MAGI Joined the Lottery Scheme Conspiracy As A Telemarketer No Later Than November 30, 2006, After Partnering With Bellini on Other Fraud Schemes

Before about November 30, 2006, MAGI was codefendant John Bellini's partner in fraudulent boiler room schemes selling grants and loans, paper rolls/office supplies, and medical supply kits, but was not part of the lottery scheme.  (See Exh. 2 (charging document from Canadian Competition Bureau describing these non-lottery schemes).  These schemes were charged by Canadian authorities, and defendant has previously advised the Court that he was convicted on at least some of these Canadian charges.  See Docket no. 716 at ECF p. 4 n.2 ("Mr. Magi has already been convicted and sentenced in

---

[1] To the extent there are differences between Exh. 1 and Docket no. 589 in loss amounts and victim counts, Docket No. 589 controls. Docket no. 589 was filed under seal in connection with defendant Adrien Stephenson's sentencing, but was produced to defendant's counsel in discovery.

3

Canada for . . . the 'Competition Bureau case['.]")  The non-lottery boiler rooms were also located in Montreal(on Montclair and on Jean Talon streets).  (Exh. 3 at pp. 1, 4 and Exh. 4 at 1-2 (RCMP evidence summaries re: MAGI).)  In addition to Bellini, defendants George Chrysanthopoulos and Lord Kofi Agyapong Mensah were also involved in one or more of the non-lottery boiler room schemes.  (Exh. 2.)  On the day the RCMP executed its search warrants, officers seized documents from MAGI's car which confirm he had a managerial role over the non-lottery boiler room scams (Exh. 3 at 5 (notebook calculating expenses like payroll; copy of lease signed by MAGI for a boiler room on Griffith Street).)

    Late in 2006, MAGI joined the instant telemarketing conspiracy.  On November 30, 2006, in a call intercepted by RCMP, MAGI and Bellini discussed the fact that MAGI had already begun pitching the lottery scheme as a telemarketer under the pitch name "Robert Knowles" in order to make some easy money before the end of the year:

| A MAGI | **I'm pretty good. I'm getting the knack of this thing here now.** |
| J BELLINI | That's what you should do for 3 or 4 hours a day, because you'll make ... **you'll get yourself out of debt and you'll make ... I'm getting Canadian leads in the next day or two; when I get them you gotta work because you'll make yourself between here and Christmas, you'll make yourself $30-$40 thousand bucks.** |
| A MAGI | That'd be good. |
| J BELLINI | Yeah. |

| A MAGI | Yeah. **Just call me Robert Knowles.** |
|--------|---------------------------------------|

(Exh. 5 at p .2 (emphasis added).)  Bellini's reference to "Canadian leads" in this call refers to contact information for potential victims residing in Canada.

MAGI told Bellini to call him "Robert Knowles," a name which he has admitted was one of the aliases he used in this matter (Plea agreement at 1, 9), so this reference confirms the men are discussing the lottery pitch.  As discussed below, MAGI was intercepted pitching the lottery scheme to potential victims using the same "Robert Knowles" alias.  His reference to that name on November 30, 2006 confirms that the above conversation concerned MAGI "getting the knack of" his new role as a lottery scam telemarketer, and confirms he was making lottery pitch calls by no later than that date (November 30, 2006).

On the following day, Bellini discussed MAGI's new role as a telemarketer with codefendant Vijayakumar Ramakrishnan. (Ramakrishnan pleaded guilty to acting as a crooked MoneyGram/Western Union operator; he fraudulently pulled victims' funds out of the Western Union/MoneyGram ("WU/MG") system.)  In the December 1, 2006 conversation below, Bellini told Ramakrishnan that their mutual friend "Rino," (short for "Alberino," i.e. MAGI), was now a telemarketer in the lottery scam, and warned Ramakrishnan not to let MAGI ask Ramakrishnan to pull WU/MG transactions for MAGI, because MAGI was supposed to go through Bellini:

| J BELLINI | Listen…um… I have…uh…your boy Rino there trying to make some money. But if he tries |
|-----------|--------------------------------------------------------------------------------------|

| | to take a short route and…uh…contact you directly…uh…with …you know…the deals there that we do. He tries anything…uh...you gotta let me know. You gotta be straight up with me. I'm…um…I'm straight with you. |
|---|---|
| V RAMAKRISHNAN | Hold on…he's trying to…[U/I] |
| J BELLINI | Listen…He's trying to…he's working with a few of my people there and…[U/I]… pulling some deal…maybe you know….he even gets you some money in the near future. But if he…he tries to…he's supposed to go through me…If he tries to go to you directly…you gotta let me know. OK? That's all I'm asking. |

(Exh. 6 at p. 2.)

The same day (December 1, 2006), MAGI spoke to codefendant Kofi Mensah and confirmed that he (MAGI) would go over to Mensah's house to make some money to pay off MAGI's bills:

| KOFI | We're at home. We're at my house. |
|---|---|
| A MAGI | Okay. I'm going to come. The fucking ... just the weather's bad. I was all the way away at the end of Ville Saint-Laurent and it's really bad. Don't tell me George drove there in his car. |
| KOFI | Yeah, he did. He- |
| A MAGI | Holy fuck. |
| KOFI | That's why he's saying ... well, we got 10 |

| | days to get one from you, right? |
|---|---|
| **A MAGI** | **Yeah, we're going to get one. Well, let's make some money. I need to come to work and make some money. I got to pay down the cards, fuck.** |
| KOFI | All right. Come by. |

(Exh. 7 at p. 2, emphasis added.)

The same day (December 1, 2006), MAGI told his business associate Gilles Tremblay (a codefendant in the separate Canadian boiler-room case, see Exh. 2) that he was now selling the lottery scam with Kofi (Mensah) and George (referring to codefendant George Chryssanthopoulos) to make some money because "You gotta pay the bills":

| G TREMBLAY: | Uh… I wish uh… you know, you wish you could have a thousand in your pocket right now I'm sure. |
|---|---|
| A MAGI: | Uh… yes, yes, of course. Fuck. |
| G TREMBLAY: | Yeah. So what are you gonna do, you're gonna go down uh… over there? |
| A MAGI: | **I'm gonna go meet uh… Gorge and Kofi, yeah.** |
| G TREMBLAY: | **What are they selling now?** |
| A MAGI: | **What are we selling? Dreams.** |
| G TREMBLAY: | **Yeah. Which one, is it the travel thing?** |

7

| | |
|---|---|
| A MAGI: | **(Laughs).** |
| G TREMBLAY: | **Huh?** |
| A MAGI: | **No, the other one.** |
| G TREMBLAY: | **The lottery?** |
| A MAGI: | **Yes.** |
| G TREMBLAY: | Oh shit. |
| A MAGI: | Not down there though, he's doing it at uh… at uh… Kofi's house. |
| G TREMBLAY: | Ok, they're not uh… they're not mixing it up? |
| A MAGI: | *Ben non*, fuck! |
| G TREMBLAY: | No?  Ok. |
| A MAGI: | *Ben non.* |
| G TREMBLAY: | Holy mackerel. I hope they uh… Ok. Well it's up uh… John… |
| A MAGI: | You gotta pay the bills. |

(Exh. 8 at p. 11.)

The RCMP's draft wire summaries for the lottery scheme calls involving MAGI show that MAGI continued to work with George Chryssanthopoulos and Kofi Mensah during the first part of December 2006.  (See, e.g., Exh. 9 at pp. 3-4 (session numbers 7392, 7621, 7677).)  Around December 14, 2006, MAGI began to work with codefendant Van Wade Bedford.  On that day, for example, MAGI told

Bedford about the calls MAGI had already made to certain potential victims to set Bedford up for calling the same people to close their deals (_i.e._, convince the victims to send the funds).  (_Id._ at pp. 12-14.)  Finally, on December 18, 2006 (just prior to the RCMP takedown that stopped the schemers), MAGI, Bellini, and codefendant April Muir arranged for MAGI to team with Muir.  (_Id._ at pp. 21, 22, 29 (session numbers 10038, 10090, 6268).)

Based on all of the above, MAGI participated in the scheme beginning on at least November 30, 2006 until the end of the scheme.

### C.   MAGI was Recorded Pitching the Scheme to Victims and Potential Victims

Transcriptions of MAGI's fraudulent pitch calls to victims Bernard B. (MAGI using the fake name "Robert Knowles") and George S. (MAGI using the fake name "Robert Ross") are attached hereto as Exhibits 10 and 11.  These transcriptions will give insight into the mechanics of the fraudulent sales pitch.

## III. SENTENCING GUIDELINES ANALYSIS[2]

### A.   The Parties Agree on the Base Offense Level and on One Specific Offense Characteristic

In the plea agreement, the parties agreed that the base offense level is six, and that a substantial part of the fraud scheme was committed from outside the United States, which adds two offense levels.  U.S.S.G. § 2B1.1(b)(10)(b); Plea agreement at p. 10.

---

[2] The PSR was issued the same the day this sentencing position was due (defendant is expected to waive the late filing); the government will respond to the PSR in a separate filing prior to sentencing.

**B.   Loss is Over $250,000 but Not More Than $550,000**

As demonstrated above, MAGI joined the conspiracy by no later than November 30, 2006.  From November 30, 2006 to the end of the scheme, 58 victims lost a total of $286,230.00.  (PSR ¶ 25, and pp. 18-19.[3]

**C.   The Offense Was Committed by Mass Marketing and There Were Ten or More Victims**

The Guidelines provide a two-level increase if the offense was committed by mass marketing, or if there were ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i),(ii).  As demonstrated in the preceding section and PSR ¶ 25, there were more than 10 victims during the time MAGI participated.

In the alternative, the offense MAGI committed involved "mass marketing," which is defined as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; [or] (ii) participate in a contest or sweepstakes. . . ."  U.S.S.G. § 2B1.1(b)(2), comment. (n.4).

For the above reasons, a two-level increase should apply.

---

[3] The victim list and dollar amounts set forth in the PSR are derived from the GOVERNMENT'S FILING OF LOSS ANALYSIS LISTING VICTIMS, DATES OF LOSSES, AND AMOUNTS LOST IN CONNECTION WITH SENTENCING, docket no. 589 (see n.1 and accompanying text) (the "Sealed Loss Analysis"), in combination with the supporting documentation as described in RCMP's Exhibit 1.  The list applicable to MAGI is a subset of the Sealed Loss Analysis, and includes only those victims, and only those dollar amounts, paid on and after November 30, 2006.  One additional victim may be added prior to sentencing (see n. 6).

### D.   MAGI Knew or Should Have Known That the Offense Involved Vulnerable Victims

The Guidelines provide a two-level enhancement for "offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability." U.S.S.G. § 3A1.1(b)(1), comment. (n.2).  This enhancement applies "where (1) a victim was either (a) unusually vulnerable due to age, physical or mental condition, or (b) otherwise particularly susceptible to the criminal conduct, and (2) the defendant knew or should have known of such vulnerability or susceptibility." United States v. Randall, 162 F.3d 557, 560 (9th Cir. 1998) (quotation omitted).  Where a "defendant 'reloads' victims by soliciting more money from those who have already proven susceptible to an investment fraud . . . the vulnerable-victim enhancement is appropriate." United States v. Lloyd, 807 F.3d 1128, 1172-73 (9th Cir. 2015), citing Randall, 162 F.3d at 560 and United States v. Ciccone, 219 F.3d 1078, 1086 (9th Cir. 2000).

In a conversation with codefendant Bedford on December 14, 2006, MAGI shows that he knows the victims are vulnerable to reloading, that is, once they fall for the scheme once by paying unnecessary funds, the telemarketers try to extract more money from them:

| MAGI | [B]asically uh… we usually hit them uh… you know, two checks of 175, that's what we suggest is the best way. Right? And then, we hit them for, you know, 25, 29. **First check is the insurance and all of a sudden we got stopped, the second package wasn't insured. If we get them all once, so once, twice and then the third time is the uh… taxes.** |

(Exh. 12 at 3 (emphasis added).)  In this call, MAGI explains to Bedford that MAGI and his coschemers usually say that the first or second payment the victim is required to make in order to receive his

11

prize is for insurance; if MAGI successfully convinces the victim to pay, MAGI or a coschemer resolicits the victim for money to pay purported taxes.  This is classic reloading.  Several of the victims who lost money during the time MAGI participated in the scheme were reloaded.  (See Sealed Loss Analysis (Docket no. 589) (see, e.g., victims AWA, GEB, JE, KF, NH, EJ and SJ, JJ, FL, and CR for examples).)

Moreover, as a telemarketer, MAGI would also know from the sounds of victims' voices that they were generally elderly.  (See Sealed Loss Analysis, listing certain victims' ages in parentheticals after their names.)

Accordingly, MAGI knew or should have known the victims were vulnerable victims.  U.S.S.G. § 3A1.1(b)(1).

**E.   The Total Offense Level is 21**

Based on all of the above, the government's Guidelines offense level calculation is set forth in the chart below:

| | | | |
|---|---|---|---|
| Base Offense Level | 6 | [U.S.S.G. § 2B1.1(a)(2)] | |
| Specific Offense Characteristics: | | | |
| Loss between $250,001 and $550,000 | +12 | [U.S.S.G. § 2B1.1(b)(1)(G)] | |
| 10 or more victims, and/or offense committed through mass marketing | +2 | [U.S.S.G. § 2B1.1(b)(2)(A)(i),(ii)] | |
| Substantial part of fraud scheme committed from outside the United States | +2 | [U.S.S.G. § 2B1.1(b)(10)(B)] | |
| Adjustments: | | | |
| Vulnerable victims | +2 | [U.S.S.G. § 3B1.1(b)(1)] | |
| Offense Level: | 24 | | |
| Acceptance of Responsibility | -3 | [U.S.S.G. § 3E1.1] | |

12

Total Offense Level:                21                    37-46 months

## IV.   SENTENCING FACTORS

The government believes that an evaluation of the factors set forth in 18 U.S.C. § 3553(a) demonstrates why a sentence of 18 months is appropriate.  This reflects a variance of 6 levels (from level 21 to level 15, at the low end) below the advisory guidelines sentence for defendant. The government below addresses the most notable of the § 3553(a) factors as applied to this defendant.

### A.   The Nature and Circumstances of the Offense and Characteristics of the Defendant

Defendant was on the front lines of the fraudulent organization: he was a telemarketer who directly lied to victims to persuade them to part with their money.  As the Court well knows, the scheme preyed on the elderly and infirm, causing substantial financial and emotional harm to these elders.  Based on all of the above, the nature of the offense was undeniably serious, and is a substantial factor supporting the recommended sentence.

Defendant is a well-educated man with an advanced degree.  (PSR ¶ 73.)  Instead of pursuing legitimate employment in the engineering or finance fields in which he was educated, he chose to commit the most egregious kind of telemarketing fraud to pay off his bills in time for Christmas.

Defendant will argue that he was the telemarketer involved for the shortest amount of time in the lottery scheme, and the government agrees that this is correct.  However, this fact is already accounted for in his Guidelines calculation by the lower amount of loss for which he is responsible, in comparison to persons like John Bellini, Jeffrey Jacobson, and Vijayakumar Ramakrishnan, who were involved for

13

a year or more and whose advisory guidelines offense levels were therefore much higher than defendant's.  Moreover, his short time in the instant scheme is tempered by his participation with Bellini in the non-lottery boiler room schemes immediately prior to this one. Accordingly, the 18-month recommended sentence is appropriate.

**B.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to provide just punishment for the offense.**

In light of the all the circumstances of this case, an 18-month sentence is appropriate for defendant, and will communicate to other Canadian telemarketers that they will pay a serious price if they engage in a cross-border scam.  A shorter sentence would be unjust give the fact that defendant teamed with numerous co-defendants who received longer sentences (Chryssanthopoulos, Mensah, Bedford, Muir), and given the $286,000 the scheme provably generated during defendant's tenure.

**C.   The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct**

The government's 6-level Booker variance recommendation relates to this factor, due to the history of this specific case.

Defendant is an average telemarketer, rather than one of the experts.  Beginning in 2015, the Court has sentenced several similar telemarketers in the scheme to below-guidelines sentences:

-Arlene Grundy, at offense level 27 received a 24-month sentence.  Her offense level is greater because she agreed to responsibility for greater loss and was sentenced before the November 2015 change in the sentencing guidelines (which affected the loss and number of victims offense characteristics).

14

-April Muir, with whom defendant worked at the end of his involvement, at offense level 27 received an 18-month sentence. Her offense level was the same as Grundy's for the same reasons. At the sentencing hearing, however, this Court appeared to have been persuaded by defense arguments (contested by the government) that Muir was involved in the scheme for only a month, likely accounting for the difference between Muir's and Grundy's sentences.

-Lori Kofi Mensah, with whom defendant worked at the beginning of his time as a lottery telemarketer, as well as in connection with the non-lottery boiler rooms, at offense level 25 received a 24-month sentence.  His offense level was higher for the same reasons as Grundy's (though he was responsible for less loss than Grundy owing to his shorter time in the scheme).

-Jeremiah Mosher, at offense level 21 (same as defendant, and under the same version of the Guidelines) was sentenced in late 2016 to 21 months imprisonment.  The Court granted the government's motion for a 5-level Booker variance to bring Mosher's sentence in line with the below-guidelines sentences this Court imposed on Muir and Grundy, with whom he worked. Mosher was involved in the scheme for about 14 days longer than MAGI (Mosher started on November 16, 2006).

-Defendant George Chryssanthopoulos (with whom defendant also worked, at the same time as with Mensah), at offense level 25 was sentenced to 36 months imprisonment.

More recently, Van Wade Bedford (with whom MAGI worked during the last week of the scheme), at offense level 24, was also sentenced to 36 months imprisonment.  The government urged the Court to impose

15

a 51-month sentence for Bedford, a highly culpable telemarketer who was involved in the scheme for more than 4 months (August-December 2006), but this Court varied downward substantially due to Bedford's frailty, health conditions, and his age.  None of those factors apply in defendant's case.

Accordingly, the lowest sentence this Court has imposed on any of the telemarketers is 18 months (for Muir[4]), and the overwhelming majority of the telemarketers have received sentences of about 24 months or more.  Defendant is about as culpable as Mosher, Grundy, and Muir, and although he may have been involved for slightly less time than Mosher (who received a 21-month sentence), that is a distinction without a difference, particularly in light of defendant's education and ability to earn a living in other ways.

Defendant is expected to request that the Court sentence him to 12 months and one day (or even less time), like codefendants Tanya Ivanova, Adrien Stephenson, and Mark Dash.  In contrast to Ivanova and Dash (Bellini's assistants, at different times) and Stephenson (a crooked MoneyGram agent), defendant was on the phone directly lying to victims.  Moreover, unlike defendant, Ivanova and Dash were more like pawns in the scheme, had no authority over anyone, and Ivanova did not realize at first that she was involved in a scam.  Defendant, by contrast, was Bellini's partner in other scams (the non-lottery boiler rooms), and purposely joined this even more insidious lottery scam to try to make fast money to pay his bills by Christmas.  There

---

[4] The government contends that Muir's sentence was an outlier, even among the below-guidelines sentences described here, and it should carry little or no weight.

is no comparison between defendant and the codefendants described in this paragraph.

Finally, an 18-month sentence for defendant is about half the sentence this Court imposed on telemarketer George Chryssanthopoulos (36 months), and is about a quarter of the sentence this Court imposed on highly culpable telemarketer Jeffrey Jacobson and ringleader Bellini (who received 68 and 87-month sentences, respectively, for their wire fraud convictions).[5]  These differences are appropriate given these defendants' higher levels of culpability and longer involvement in the scheme.  Taking in all the sentences imposed so far in this case, an 18-month sentence for MAGI avoids unwarranted sentencing disparity.

**V.    CONCLUSION**

For the foregoing reasons, the government asks this court to sentence defendant to a term of incarceration of 18 months, to impose 3 years supervised release, a $100 special assessment, and an order of $286,230.00 in restitution.[6]

---

[5]  As the Court is aware, Bellini's 87-month sentence was a reduced sentence due to his substantial downward departure for cooperation.  Similarly, Alexander Andriopoulous, the very first defendant who surrendered even before extradition proceedings, received a similarly substantial departure for his assistance in the case (which was linked to the extradition of all the other defendants) and received probation.  For these defendants, any sentencing disparity is warranted, not unwarranted, because defendant MAGI did not cooperate.  18 U.S.C. § 3553(a)(6).

[6]  The government may have left one victim off the restitution list by mistake, and will clarify this issue in its reponse to the PSR prior to sentencing.

17